Good morning, Your Honors. Thank you very much for having us and good morning. I'm Scott Camber on behalf of the Best Companies appellant. The Best Companies believes that there are four primary heirs, categories of the heirs of the district court. One, by its plain terms, as the court said in its final approval order, it stated, by its plain terms, the settlement does not exclude corporations. We believe that is an error. We believe, indeed, when one reads the settlement agreement as was referenced in the final approval order, as well as the preliminary approval hearing in order, there is no reference to the non-natural persons, and in fact, we think that the plain reading of the settlement agreement makes clear that individuals were not intended to include corporations. Secondly, in order to distinguish in-ray graphics and the need for differentiation of the representation for the class representatives, the court made the observation, the record in page 35 in its final approval order, that corporate purchasers, in particular the Best Company, was no different than the individual purchasers, making in-ray graphics inapplicable. But this is, indeed, not true, as there are, as the court itself observed, that there are challenges to the corporate claimants that just don't exist for the individual claimants, such as attestation. And to group all of the corporate objectors as having an issue simply because they have more phones, this is not a matter of being quantitatively different. It is qualitatively different. Thirdly, the new... So, counsel, this argument wasn't raised below. This textual argument was not addressed before the district court. Is that correct? It was in the court's... That is correct, Your Honor, in the sense that it was raised that it didn't apply, but specifically the language from the settlement agreement is attaching to the court's order on ER, at the record on page 35, where the court states that the plain reading, that by its plain terms, however, the settlement does not exclude corporations, bringing into question the settlement agreement itself and the reading of the settlement agreement. And in the opening brief that we had on appeal, we're addressing that point in particular. You know, I noticed during the hearing, the district court referenced some earlier discussions about whether non-natural persons should be included and made a statement that that issue had been resolved. Now, you know, we don't have the details on what the background discussions were, but it was something that the district court raised before the final settlement agreement was approved, and nobody piped up to say, wait a minute, that's an issue that's outstanding that we want the district court to still resolve. That language wasn't in the preliminary approval order and the case law provides in the... That was raised for the first time after the objections were submitted by the court by talking about the plain reading of the settlement agreement, and that is why we raise it there. If the court were to believe that we were raising that argument for the first time, the textual argument about whether individuals applies, whether in particular, whether we go back to the settlement agreement or we don't go back to the settlement agreement, that issue was raised in our objection, because that is key, the plain reading of the settlement itself and also the court incorporating the settlement, because the settlement defines U.S. owners to include all individuals, and the court in its final approval order said the court recognizes that initially there may have been some uncertainty about whether the non-natural persons were included in the class, recognizing that, and then it says the issue has been resolved, and that's in the final approval, and that is the language I think you were referring to in the final approval order. Thirdly, so dealing with in-ray graphics, the court believed that there didn't need to be separate representation during the settlement negotiations for the non-natural persons, even though it's clearly, I think, it's been established at this point that the notice issues for the non-natural persons as well as the attestation issue are unique and provide unique challenges. Let me ask you about the notice issues, because Apple represents this. I understand that it really doesn't have a way to identify corporate-owned devices, so given that representation, how could notice be better provided to entities like your client? In the order itself, in the preliminary approval order, the court ordered that email shall be provided for whom Apple has a valid email address, but it didn't stop there. It then qualified that pursuant to the settlement agreement with the following, for the account of record on the Apple ID. So the issue is that the, it wasn't that Apple sent it to all of their email addresses that they had. They necessarily limited it to only those email addresses that were used to register for an Apple ID, which are necessarily individuals. If I'm a corporation and I buy 100 phones, those phones, the Apple ID is going to be associated with the emails of those users. Sure, but it's reasonableness, so why wasn't that reasonable given, I mean, the people who, the individuals who basically have the phones in their hands and utilize it, they're the ones who can tell whether there's been a diminishment of performance, right? So why wasn't it reasonable to target those individuals to receive notice? Completely reasonable if there were only to the individuals in the settlement agreement, if that was only people who were releasing their claims. But here the claims are being released for absent class members and in this case also the non-natural persons. So the best practicable notice needs firstly to be directed at the class pursuant to Rule 23. Those emails, they limited the emails to only those with the user IDs. So if I was a corporation and I went to the Apple store with my Apple corporate account and bought 100 phones, and they sent me my bill, my invoice to my email address that's itdepartmentatibm.com or acme.com, I wouldn't be getting notice for the settlement to that email address. Apple could easily have sent this notice to all of their email addresses that they had. They could have easily also had publication notice that would have been directed to people who didn't get the email notice, whether it went to the spam folder or something else. Things that are very commonplace in almost every class action that I've been involved in, and anybody that's been involved in, there's almost always some type of catch-all notice. There wasn't here. And they added the sentencing. I think I've got your argument, but I'm trying to help you out by reminding you of the time that you wanted to reserve. But utilize it however you wish. I will. I've got 3 minutes to 45. I will reserve my remainder. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, John Pence on behalf of the Pantone and Feldman Appellants. Class counsel pled this case based on a uniform theory of damages that alleged that every class iPhone was harmed in the same amount, and arguing below that there was no way for ordinary consumers to associate diminished performance with the software update. The case, in fact, survived a motion to dismiss because the district court held the plaintiffs had adequately pled class-wide injury that did not depend on individual awareness of diminished performance. Nevertheless, the plaintiffs and class counsel agreed to settle the case, agreed to a settlement that compensates only a tiny subset of individuals who can attest that 3 years earlier they had experienced diminished performance of their iPhones. In reviewing the settlement, the district court failed to give the settlement the heightened scrutiny required by Salcio and Rose, and instead employed a presumption of reasonableness and deference to the parties' decisions that has no place in Ninth Circuit law. Counsel, let me just jump in real quick. My understanding is that you did not raise this argument until the reply brief in this case. Is that correct? That is correct, Your Honor. But in Salcio, well, I mean, it's not harmless error, in other words. Well, but why isn't it waived? It's not waived because it was in our reply brief responding to the appellee's arguments that because the handling factors were somehow satisfied that that meant, you know, the court should approve it because of the... But the error here was made... Abusive discretion. The error here was made by the district court in the first instance. I'm just trying to understand why, if it's so clear it was wrong, why wasn't that in your opening brief to this came out right when we were drafting our reply brief, and it... No, that's a fair... It reminds... Yes. That's a fair point. But there was Rose. Rose was already the law. So, yes, I mean, we... Counsel, can I ask you, assuming we were to reach this and decide it was not waived, if we agreed with you that a heightened pleading standard was not applied here and should have been, do we need to go further with any of your other arguments, or is that sort of the end? We would just remand it based on that? Well, Your Honor, we would ask that as in Cecile and Rose, that the court also go on to address the problems with the settlement in our view that are, you know, that motivated the appeal. One of which is, Apple argues in defense of the settlement that individuals who cannot attest to diminished performance are not injured, and therefore deserve no compensation. If that is so, then TransUnion tells us they don't have Article III standing, and the district court had no jurisdiction to release their claims. If, on the other hand, everybody in the defined class has injury as the plaintiff's pled in their complaint, then it was a breach of the duty of adequacy to release those claims for zero consideration. It's kind of, in our view, an either-or. If you're giving them zero. But I thought, counsel, in TransUnion, I thought the Supreme Court declined to address the issue whether every class member had to demonstrate standing before a court certifies a class. Well, Your Honor, that was not my reading of TransUnion. I believe that the court held that the class that was certified in that case below was overbroad because not all of the credit reports had been published to a third party, and therefore there was no defamatory communication. And therefore, the class had to be narrowed. I will concede that that was a litigated class action, and this is a settlement, but I believe the same principle would apply. That everybody in a defined class has to have at least Article III standing, or the court can't release their claims. There's just no jurisdiction to do that. With regard to the attorney's fees, we do not agree that this was a percentage of the fund fee. A careful reading of the court's fee order reveals that the calculation that led to the court's ultimate fee award was a lodestar multiplier calculation. The court rejects the 28 percent requested fee as excessive. The court then turned to some million-dollar mega fund, but then the court turned to the lodestar calculation. It doesn't later calls it a crosscheck, but it could not have been a crosscheck at that point because there was no fee award to crosscheck. There was no number to divide by the lodestar to see if that was adequate. The court basically established a ceiling on the multiplier, saying a 2.232 multiplier. Anything higher than that would be windfall profits to class counsel based on the hour's worth. It seemed like, even though it wasn't, frankly I was a bit confused on what was going on with the fees, but it seemed like the district court was utilizing the benchmark and then utilizing other methods to figure out whether he should go up or down from that, which is usually how crosschecks are done. You're correct, Your Honor, but our argument is the court never made any finding on any of the factors that would justify an upward departure from the benchmark, and yet the court approved the 26% fee award. After citing to the cases and the empirical studies that say in a mega fund of this size, the fee should be something less than 25%, but the court seemed to disregard all of that based on its lodestar crosscheck, or its lodestar calculation, excuse me. But then later when it confronted Apple's objection, as well as ours, JCCP counsel fees are not properly included in the lodestar because that was a separate case and didn't create the benefits here, the court said, well, elimination of $4 million of time wouldn't make a difference in my ultimate conclusion, when in fact it raises the multiplier to 2.7. And then finally, with regard to the attorney's fees, we'll rest on our brief with regard to the Trustees v. Greenock argument. I know that's been dealt with by other panels since Johnson, but the one thing that's clear is that payment to foreign plaintiffs who are not even class members, this is a class settlement on behalf of United States iPhone owners, is a violation of this court's not only state and v. Boeing opinion, but also in Rose, the court held that side settlements of claims not covered in the class settlement is not permissible when a case is pursued as a class action, and that's directly from Rose. That's what happened here. They used the class settlement funds to resolve their issues with these foreign plaintiffs who had filed cases here, but that were not certified. Thank you, Your Honor. I will rest. Thank you, counsel. May it please the court, Ted Frank for Appellant St. John. I'd like to simplify the attorney fee issue if I could. At page 13 of the court's fee order, which is page 24 of St. John's It then awarded an upward adjustment. That contradiction has to be reversible error. This court has said in cases like Paget and McCown that district courts have to show their work, that they have to explain their reasoning for a departure from the benchmark, and everything the court said said the court should not depart upward from the benchmark. It said the better approach is to go not by anecdotes, but by the empirical evidence, and that empirical evidence, as the court found, was for a settlement of this size, you're looking at a 10 to 20 percent range, and then the court has this non sequitur. I hereby award 26.3 percent. I thought it got to the 26.3 by taking the Lodestar and then applying a multiplier. It's interesting because if you look at the multiplier, the multiplier isn't on its own outside of the normal range that you would apply. Do you think that the attorneys fees that were considered to the Lodestar, was that an abuse of discretion for the district court to quantify all those fees, or were there a lot of fees that were included that should have been, that were over billing, duplicate billing? So there are multiple problems on the Lodestar. First, the district court calls it a Lodestar cross check. It didn't say I'm awarding fees because of Lodestar, and I think you might be right that that's what it actually did, but throughout the opinion, it calls it a cross check and that the judge awarded as a percentage benefit. But if we call it a Lodestar based award, then we have other problems that we raise, and that's the violation of Mercury Securities in that class members never got the opportunity to scrutinize the Lodestar, and the Lodestar clearly had problems. You're talking 47 firms, 68,000 hours, and we didn't get a chance to look at that, but what we could look at showed that they were over billing for document review. Apple pays maybe 30 to 40 to $50 an hour for document review, and the class was being billed at $350 an hour for that. The class shouldn't be billed more than the defendant. Mr. Pence raised a number of issues in terms of over billing, and no telling what we could have found had we added the opportunity that Mercury Securities and Apple 23H requires to look to scrutinize a Lodestar, the billing records, if the court is going to make a Lodestar based award. If it's just doing a cross check, that's a different question, but a cross check implies that it's arriving at a percentage and then is cross checking the percentage against the Lodestar, and as you point out, Your Honor, the court seemed to be going in the other direction, and whether that's an error, perhaps, but everybody seems to agree that the court based its award on a percentage, and if the court is going to base the award on a percentage, then it can't find the Vizcaí factors don't support an upward adjustment. It can't find the empirical evidence, which I think is the for a mega fund. One more issue, if this does go down on remand, we'd like the district court to, and we think it's error that it did not under Dennis V. Kellogg, we argued that it influences the Vizcaí factors, the first factor in terms of the success, and the third factor in the skill and quality of the attorneys, that the claims process was so mangled. Similar settlements for much smaller amounts of money have achieved 18 to 22% claims rates. Here, the granted claims rate is well under 3%, and because of that, $190 million was left on the table. My struggle to really understand your claim rate is that it really is based on the assumption that everybody who had the devices and has uploaded or used the software suffered the damage, right? That is the point that is heavily disputed, and so the claim rate depends on how many of the total number, 80, 90 million plus people, actually suffered any damages. How could the district court fix that issue if we were to remand? Apple seems to know what that number is because they're able to say this serial number is in the class, and this serial number doesn't get to claim damages, so they should have a count of serial numbers, and then they can tell us what the real denominator is, but all we had to do was get the claims rate up to 12% to get to the 500 million instead of the 2.5%, and as Facebook, Biometric, and Google Plus show, that's very plausible to where class members could get just a dollar, a dollar and change, so it's kind of extraordinary, and we document this in our brief with citations to the record, how the settlement administrator just failed to do basic things to get the claims rate up. The rest of my time is for  discussion. Good morning. May it please the court, Mark Malumfy for the appellees and the class plaintiffs below. I'd like to start off my presentation with describing the settlement, which we describe as, and the court found, to be an historic settlement and a claim of immense difficulty and risk. At this point, it's easy to go back and say, well, this was a riskless case. Many people sought to be lead counsel. As the court found in its order, this was an extremely difficult case, especially after motions of dismiss, with two computer intrusion claims left. Those remaining claims framed the litigation, framed discovery, and ultimately framed our settlement negotiations. They also frame the claims process. The error that you've heard here below, allegedly, relates to the need to have an attestation or a claim form process. Yet this court, as recently as the Hyundai case, and many other cases that have applied Hyundai, both in this court and other district courts, have routinely approved the use of a claim process or an attestation to show injury. The mere fact that there's a class that includes people that are injured and not injured is not somehow suspect, does not create conflicts, nor was it air for this court to approve an attestation in this case. In fact, the very concerns, Judge Nguyen, that you identified in your decision and the embanked decision in Hyundai exist here. Apple did not have records of people who had downloaded the software and experienced diminished performance. That's why we used a claim form. And Judge Davila, the district court, carefully considered the same objection below, making the same point. It was there to identify those who were injured and prevent fraud, to make sure the money went to the people who were injured. You've got a problem under Rose and the standard of reviewing the final settlement approval process because the district court really did it. I don't know what he really did, but he said in his final approval order that he's giving deference to the private consensual decision of the parties and that he was going to give a presumption of reasonableness to the recommendations of class counsel. Well, that quote is respectfully, I don't think we have a Rose problem. In fact, if there's a spectrum of heightened scrutiny, and the court has never defined what heightened scrutiny is, but if there's a spectrum, Rose and Salcillo are on one side, this case is on the other. Let's assume that there's a spectrum. Is there any place in the district court's approval order that shows us that he applied any type of heightened scrutiny? Absolutely. And can you give me a citation to those pages? Do you have them handy? The court, for example, conducted two full days of hearings on this settlement. It considered every objector. Every objector had the chance to present. It then considered their objections. It looked for signs of collusion, which was the concern that animated the Rose decision. The court did not rubber stamp this settlement. And I'm not suggesting that the court rubber stamped it. I think the district court was careful and gave careful consideration to the objections. The problem is that the presumption of reasonableness really should not be applied. And that's what Rose stand for. Setting aside the waiver question, as Judge Owens pointed out, this issue really was brought up before us in the reply brief. But setting that aside, if we look at the substance of the argument that was raised in the reply brief and compare that to what the district court said in its order granting final approval, I think there's a problem. So I want to give you a chance to fully address that. Absolutely. And I appreciate that. The difference between Rose and this case is the court did not apply a presumption of reasonableness to this settlement. It did not apply any presumption of fairness to this settlement. That's what made Rose distinguishable from this case. That's why the court sent it back in Rose. Because the court, if you look at that, started its analysis. That's right in the Rose opinion. Same thing in Cecilia. It started its analysis with a presumption of reasonableness. The court did not do that here. It did admittedly have a quote within a parenthetical at a string site on page 11 of its opinion, referring to the recommendations of counsel. But the recommendations of counsel were then addressed specifically later in its order, in which it addresses the process in which the negotiation was reached, the use of a mediator, and found that there was no collusion. It didn't apply a presumption. Counsel, the problem that I have with your argument as you're reciting it is all it says is that the district, you're just making the claim that the district court checked the boxes and walked through each of the arguments. But if we're reviewing an agency decision under arbitrary and capricious, I mean, we still have to make sure that they, the agency walked through everything, but we give great deference to what they did. And it doesn't, when you read it, it doesn't suggest that the district court went a lot deeper than just going through all the arguments. There's, it doesn't look to me like the district court engaged to the degree that we might expect the court to do on the substance of some of the arguments that were raised. And, go ahead. I didn't want to interrupt your honor. Nope. I disagree. I think, in this case, the opposite was true. I mean, we had two full day hearings. In between the hearings was several months in which the court asked for additional briefing on matters raised by the objectors. Additional briefing relating to the claim damages and the apportionment and whether this was a fair amount. Additional briefing relating to the NNP issue that you've heard here today. It then held a second hearing It, it, this was a searching inquiry, which is what the court, this court has directed district courts to do. It's hard to come away with the conclusion that there wasn't a lot of deference given. Because, I mean, you didn't see much haircut at all on the fees that were There are some anecdotal points to this that suggest that the problem that Judge Wynn laid out actually carried through in the ultimate decision. If that was the only example of a searching inquiry not being done, I'm prepared to address that. The only example raised in the brief, which was only raised in the reply, was that the district court somehow compared the $25 per device distribution toward the total amount of damages. But there are many examples throughout the brief in which he also analyzed the damages based upon a gross level. He looked at the $7 amount, assuming every 90, every one of the 90 million people submitted a claim and found that to be a reasonable distribution. The $310 million as a gross level was 30 or 40 times the next largest settlement. These claims are the legal graveyard for plaintiff's counsel. Of 400 reported cases, computer intrusion cases, we found 10 had resulted in a recovery. This was 30 times the next largest one. So I think certainly that was a relevant consideration for attorney's fees, the results achieved. Certainly the court gave us near the benchmark. I admit that. We deserved it, respectfully. And we deserve to do that. This court has historically and repeatedly said that district courts are on the ground level. They're in the best position to evaluate the work performed, the risk we undertook, and the results that we achieved. The district court here had the case from its very inception. This was not a case in which we were over-billing. We cited, for example, the fact that the court, in its first order in this case, put together a billing protocol and appointed as a member of our executive committee an attorney whose sole responsibility was to evaluate timesheets to make sure that it was actually for work, lead counsel assigned, that there was no duplication. We submitted quarterly reports to the court throughout the case and a summary of all our work by timekeeper, by work code at the end of the case. So this was not a case of over-billing. In fact, the one objection that was raised at the time, that we were somehow using contract attorneys, turned out to be false. We didn't use any contract attorneys. That was just a false accusation. There was an accusation that we had somehow over-billed our paralegals or other attorneys for document review time. We agreed to cap our contract review time. So I think, again, the court carefully considered all of these factors in arriving both at the percentage-based fee as well as the Lodestar cross-check here. There was not an attempt to over-bill, and more importantly, the court certainly exercised its discretion, having been on the ground floor evaluating that work. I would also like to point out for purposes of what we heard here today, there was nothing wrong with the court's fee analysis. In fact, we would submit it was perfectly acceptable and followed the Vizcayano standard. Let's talk about that. The district court did not address one of the objections regarding the inclusion of fees by JCCP counsel, and I'm looking at now F-028, as to why the district court said he didn't need to do it. He said the objection had some merit, but it wouldn't really have any bearing, or not a significant bearing, on the Lodestar. The problem that I have with that is that if the district court had addressed the merits and said, okay, well, I think the fee should be excluded, then that jumps the multiplier, I think, above what the district court had earlier said would result in a windfall. So how do you reconcile that? On the one hand, the district court said, look, anything above a 2.232 multiplier would result in a windfall to class counsel, but then I don't need to really figure out whether the fees billed by JCCP counsel should be included. The math doesn't seem to really work out if you can't reconcile what the district court said about what multiplier would be too high for this case. Well, first, how I read the order, and I think the way it played out in court, was we had sought a 28 percent, 28.3 percent, which resulted in a certain fee of $87,000,000. So, the Lodestar that the court was looking at when it said that the 2.4 was too large was based upon the percentage that we had requested. When it held that 26 percent was a more reasonable amount, applying the Viscano factors, applying the benchmark, and adjusting it upward or downward, just as this court directs district courts to do, considering all the factors, not just empirical studies, but all the factors, that's how it arrived at the 2.232 multiplier. So, it's consideration that the JCCP time, the court found, was, because it was used for purposes of the Lodestar cross-check, was appropriate to include that time. And even if the court didn't include the JCCP time, the Lodestar multiplier would be larger, would be over the 2.4, but again, when he's referring to the 2.4, he was referring to it in respect to our 28 percent request. I don't think the court was saying that if we exclude the JCCP time from a Lodestar cross-check, all of a sudden, we should still apply the 2.232 multiplier. The multiplier he was referring to was vis-a-vis the 26 percent award. Hopefully that makes sense, but that's clearly what was happening here. He wasn't holding that a 2.232 should apply, regardless of whether you use the JCCP time or not. And can I just spend a minute on the state council's time? There is nothing that they have provided that requires the district court below to not consider state court time. They provided one case in which the district court exercised its discretion and did not include it. And this court found that's not an abuse of discretion. But there's no court that's ever held that you cannot consider state court or parallel litigation time in determining what's a fair Lodestar. And in this case, it's essential to include their time. From the beginning of the case, the state court case was pending in San Francisco. The court insisted on coordination between the federal and state cases. It appointed, as a member of our executive committee, a state court liaison council whose sole responsibility was to work with the state court council. We closely coordinated. We conducted discovery together. We sat in depositions together. This was not a sense where you had one case that was proceeding side-by-side, but we never worked with them and did not benefit. And I don't question that. I mean, we can't, sitting here, remotely come close to comparing our knowledge of the case and getting our arms around this massive MDL litigation compared to a district judge who's had it in the beginning. So we recognize that. And of course, I'm sensitive to abuse of discretion review. And I think one of the councils said, well, the district court has to show his work, and we're not going to nitpick. But the problem I have with this is that the district court did say this is going to be an insignificant impact on the multiplier, and that just isn't so. So, you know, whether that warrants a remand, I think that's something we'll have to take a look at. Admittedly, but I think you only get there if you find that the time should not have been included. The other point is, none of the... Do we do that on appeal in the first instance? Isn't that the district court's job to figure out that objection and address it one way or the other? None of the objectors raised this point. Not one of them raised this point below. All right. Your time has expired. Thank you. Thank you very much for your argument. Good morning, Your Honors. May it please the Court. Chris Chorba on behalf of Apple. I would like to channel Judge Dalville a little bit in my presentation. I plan to address four issues. The standard of review, the corporate claimants, this alleged discrepancy between uninjured class members, and then a new argument that I heard for the very first time at this podium by Mr. Frank, that there should be some adjustment to the claims rate on remand, which was never briefed. But let me start by focusing on the factors that this Court has told district courts that they must consider. One quarter of Judge Dalville's 36-page final approval ruling walked through, in painstaking detail, the Hamlin factors. You saw no discussion of those factors in any of the objectors' appellate briefs, and you heard no discussion of those factors here today. And yet, those are the factors that this Court has said a district court must consider in determining whether or not a settlement is fair, reasonable, and adequate. The reason why you didn't hear any discussion of those is because this is the rare case in which each one of those factors supports final approval. And there's no question that Judge Dalville, who lived with this case for two years, dealt with extensive discovery in motions practice, understood that the settlement here was plainly fair, reasonable, and adequate. Now, as to this issue as to standard of review, first of all, the objectors just admitted this morning that the reason they didn't raise this issue in their opening brief is because they filed their opening brief. Well, I'd like to quote from Sissu at page 1129, We did not announce a new rule in Rose, but rather reiterated a number of our previous holdings. So Rose was the law, and they had every opportunity to present that in their opening brief. An appellant cannot raise an issue for the first time in a reply brief, giving the appellees no opportunity to respond. But I understand this Court wants to satisfy itself that Judge Dalville applied the correct standard. And there's no question that he did. Yes, it is true, as Mr. Malumpy indicated, on page 11, Judge Dalville states further, the recommendations of plaintiff's counsel should be given a presumption of reasonableness. Well, that is true, he said that. But the difference between the district court order in this case and the district court order at issue in Sicilio was he didn't then go back to that presumption and apply that presumption when analyzing the Hamlin factors. Rather, he independently reviewed each of the factors against the record in the case and concluded that each of those factors actually supported final approval. Now, it's also true that one of those factors is actually the recommendations of counsel. And so we would submit that the record supports that he was evaluating the recommendations of counsel in the arm's length negotiation, not applying the presumption of reasonableness. Now, the other thing that I would ask this Court to consider is you've given the district courts a lot of instructions in terms of how to apply heightened scrutiny. You've stated multiple times that when there's a pre-certification settlement, as we have here, there should be heightened scrutiny. You've also stated that the Court should be aware of specific warning signals or signs of collusion, and that was in the Bluetooth case. And here, Judge Davila went through, analyzed all of those factors, concluded each of the Hamlin factors support settlement, and also ruled, and this is at ER 49, page 17 of his ruling, that the settlement here was guided by a respective mediator, and there were no indicia of collusion that this Court has identified. I would also ask this Court to consider the Lane v. Facebook case from 2012, in which the courts held specifically that there's no specific length requirement or no specific text requirement in a final approval order. In fact, the Court held that there was a very detailed final approval order in that case, and there were specific factual findings about arms-length negotiations, which demonstrated that the district court's review complied with this circuit's requirement to apply heightened scrutiny to pre-certification settlements. We would submit that that's exactly what occurred here. And how many levels of heightened scrutiny... Counsel, I don't want... I'm hesitant to interrupt you. This is very helpful, what you're saying, but is your position, just to summarize it, that regardless of what the whether they're giving deference or a presumption of reasonableness to the settlement proposal, that as long as it walks through those factors, that's all it needs to do, and that's where we should be focused on? Or, I mean, couldn't you still walk through the factors, but have applied a improper presumption that needs to be addressed? Yes, Your Honor. My submission to you would be that you have to look beyond what the Court says in one line of the legal standards section, and you have to actually analyze the opinion. And here, there's nothing from that opinion or the seven-plus-hour approval hearings that the district court conducted to suggest at all that there was any deference to the parties. Quite to the contrary. The district court pressed us. The district court asked for additional evidence. Plaintiffs' counsel submitted a detailed expert report that walked through the range of potential damages, the range being $18 to $47, I believe. There was extensive submissions, and what Lane instructs, Lane versus Facebook, is that you can't just look at language taken out of context, which is what we submit the objectors are doing in their reply brief, and conclude. You have to look at the overall opinion. That's exactly what happened in Lane. Let me ask you this question, because I asked the plaintiffs' counsel this question. Can we consider the deference that the district court may have given on the attorney's fee award and read anything into that as far as the reasonableness of the settlement, or do we have to distinguish those totally separately? Your Honor, I would respectfully ask you to consider them totally distinct. The approval of the settlement, if Judge Daville awarded $0, the settlement could still be approved. If he awarded what he did, which we argued vociferously in the district court was inappropriate, we've chosen to focus our appeal on the settlement itself. But the settlement can and should go through. So to the extent you have issues with what he did in his settlement approval order, or excuse me, in his attorney's fee order, we would ask you to distinguish that. There's no precedent, and we would urge you not to make one today, where you'd have to consider a distinct order, which is wholly independent from the underlying settlement, and suggest, well, I don't like what he did here. I'm not saying this is what you're saying, but I don't like what he did here. That raises red flags about what he didn't say in his final approval order. And again, Lane instructs that you have to look beyond the opinion of what the court did, and we would submit here, the decision is fully consistent with Rose, it's fully consistent with Bluetooth, and it's fully consistent with every other decision this court has given, instruction this court has given to the district courts as to what to do. Only if we set aside the entire section on standard of review. Well, Your Honor, no. To get there, right? No. I would submit no, because the standard of review goes on for about a page and a half, and there's one specific line. Your Honor, I wish Judge Davila didn't say, further, the recommendations of plaintiff's counsel should be given a presumption of reasonableness. But one line in a settlement approval order doesn't justify upending the entire settlement. Again, the cases instruct that you have to look at the entire decision. And he goes on right after that page. Well, I mean, it really starts at the very beginning when he says, in reviewing class action settlements, the court should give proper deference to the private consensual parties. What you're saying is that set aside what he says. These are essentially quotations through various case laws, like maybe sloppy drafting or imprecise drafting, but then look at the record, look at what he actually did, and essentially said, we're not going to go by what he says he applied in terms of standard. What he actually did demonstrates heightened scrutiny. That's what you're saying, right? Exactly, Your Honor. And moreover, the difference between this case and Celsillio is he then goes on from the pages we're discussing for nine pages at length, discussing the handling factors, discussing the record evidence. At no point in the rest of his decision does he say, Ty goes to the runner. I have to defer to the parties. He never does that. And I think that's the key distinction between what troubled this court and those other decisions. Let me ask you this. If we don't apply the waiver doctrine, given that this came up in the reply brief, would that result in any prejudice to the settling parties? It would, Your Honor, because we were not... What's the prejudice? The prejudice was there was extensive briefing in the district court. There were at great expense. We've had to deal with many objectors, both here today and in the appellate briefs, and we weren't given an opportunity to address this. So to the extent the court is considering looking past waiver, at a minimum, we would ask for an opportunity to brief this issue because it was raised for the first time on reply, and we had no opportunity to address it. I'm trying to do my best to address it here today, and I've had time since the reply brief, but that's not the way appeals ought to work. So we would submit that there is prejudice by considering an argument for the first time on reply that, again, Sicilio itself said we did not announce a new rule in Rose. Rose was available in the district court, and they never cited it there. I was going to ask you, Counselor, because I'm not sure which way this cuts, but they did...Mr. Frank did cite Rose to the district court, but for a different proposition. He did, for the notice proposition. Right. So everyone knew about the case. They didn't say anything about it then, and to your point is, why should they be able to say something about it now? That's right, Your Honor, and we need to understand, Sicilio itself, there was a waiver argument in Sicilio, and the argument was, well, you never, you know, raised this issue, or you raised this issue on appeal for the first time. You didn't raise it in the trial court, and the panel easily disposed with that waiver argument by saying, well, come on, the objectors didn't have the final approval order at the time of the district court, and there's no requirement under Rule 59 or 60 to set aside that judgment. Okay. I'm going to make a different point when I get to the corporate objectors, because there was a ruling, and all of these issues could have been addressed, but at least here, again, that decision was cited. I think it cuts against objectors because it was there, and again, we never cited Rose. We never cited this presumption in the final approval paperwork. Plaintiffs didn't cite this assumption. The district court, again, put this in its ruling, but again, Lane and other cases instruct us, let's look past that, and I would ask this panel to also consider, what are we going to achieve by a remand? We're going to send it back. These sentences would presumably be deleted, but what does the panel want Judge Davolet to do that he did not do? And I would submit that there's nothing in this record to suggest he didn't conduct the searching inquiry that this court's told district judges to undertake. If I may pivot. But counsel, what do we want him to do? Maybe set up front the standard that he's actually applying. I mean, even if you're right that he did the searching inquiry, where it's based on an improper legal standard of review up front, shouldn't he have the opportunity to correct that? I mean, how do we know? How do we know he would? Maybe you're 90% right that he would reach the same standard, but shouldn't we give him the opportunity to take a look at that? Well, Your Honor, I would submit that he already did that, and that's my point, is that you're right. He would acknowledge this decision, but what I'm saying is nothing's been presented to you, perhaps because it's been raised for the first time on reply, as to where applying what they contend is the correct standard would impact the... Could have changed the outcome. Exactly. And I'm cautious. I know harmless error does not apply in this argument, but it is a quintessential harmless error in the sense that he's actually applied that heightened scrutiny. Not a single one of the handling factors mitigates against final approval, and not a single one of the Bluetooth factors is present here. There's no reversion. Can I ask you real quickly just about this standing issue? Is there a standing problem here that we need to consider at all? The objectors say, well, by definition of how the class is set up, then a big chunk of this class, there never would have been standing. But when I... In footnote four of TransUnion, it says, the Supreme Court said, we do not address the distinct question whether every class member must demonstrate standing before a court certifies a class. Are you aware of binding case law that says that standing has to be considered before certification? I am. This court said that in Mazda, and then recently in the Olean decision, this court, in an impoundable decision, walk that back and said no. That injury is one of the many factors you consider as part of the predominance inquiry, but it is not. There's no sort of de minimis requirement that you need to meet a specific threshold of injured class members before you can certify a class. And the court said you can't presumptively deny certification if, for example, in that case, there was 5% admittedly uninjured class members. But to pick up on that point, Your Honor, with respect, there is no discrepancy between the class members and the ultimate release here, which is what I think this issue really goes to. The court has upheld many times settlements that require an attestation of injury as a condition for getting money. Let's remember what this case is about. This case isn't about every iPhone user of the devices that were part of the class. This is about a specific claim that through a software update, Apple affected the performance of those devices. So there was a misstatement earlier. The class here is not everyone who owned an iPhone. The class is everyone who downloaded the specific software update during a specific time period when there was alleged lack of complete disclosure. And so Intelligender is an example of a case where this court cited with favor a claims process that was a birth gender prediction test, and you had to actually attest to get money that the gender of your baby was incorrect. And the class released everybody who had. So I did want to address the corporate issue, but I see my time is up. I would just end. I know your time is up, but I do have one question that I'd like your help with. Can you address the claim rate? Because I thought that there was a representation that Apple really couldn't figure out the denominator, and I heard one of the counsels, I can't remember who, saying that you do have the ability to figure that out. I can clarify that. Your Honor's question was exactly right. One of the representations was assuming a 100% claims rate, which you just can't do. What we were able to determine in issuing the notice, which reached 99% of the class here, was we were able to determine during a specific period of time which devices, not which individuals, which devices downloaded the relevant software updates that were at issue. So that was the denominator that was used for purposes of calculating notice. The notice then went to the individuals of record for that particular device. So the claims rate here, to the extent there's discussion of a 3% claims rate, it's measured against the devices. So it's a device-level claims rate. We don't know who actually installed the updates. We only know which devices downloaded them. And, of course, devices change hands over time. There could be a download of an update and an update's not actually installed. So we don't think that's an issue at all. But Apple could not say with precision, this person is in, this person is out. Rather, we used serial numbers in order to identify notice. We went to our records whose Apple ID is associated with device, this device, and we issued notice to that person. And certainly there were examples where there were multiple claims for the same device. And the settlement contemplated that, and the settlement addressed that. But just on this point, as to the corporate claimants, corporations did receive notice. Corporations got notice. If you registered, if I registered through a Gibson Dunn domain, I received notice. Now I wouldn't be eligible for other reasons. But the notion that we should have issued notice to all corporations, all it would have done was cost more money and create mass confusion. Because if we issued a notice to PepsiCo and everyone at PepsiCo, a significant portion of those devices would not be eligible. What percentage of the total claims were corporate claims? It was one-third of the total corporate claims. Just under one million of the total three million claims were from corporations, which we think illustrates that corporations received notice. They were part of this. And Judge Davila issued an order before final approval where he specifically stated he ruled on Mr. Camber's motion. Corporations are part of this, and non-natural persons are part of this. So they had an opportunity to opt out. Mr. Camber's client didn't opt out. Mr. Camber's client is pursuing a separate class action in the Northern District. His client either doesn't have standing because his position now before this court is I'm not a class member. Right. We're aware of that, and you've answered my question. But you're over time. Let me see if my colleagues have any additional questions. Mr. Townsend, thank you very much. Thank you. There is an important constitutional issue for the rights of the absent class member for the corporations. The judge, the word corporation, Apple has admitted, is a substantial proportion of the amount of claims and a substantial amount of the claimants and people eligible to submit claims. We don't know what that number is. How that performs if there's three times more corporate owners than individual owners, that's a much different situation, and there's no evidence to that. There is no waiver of any argument by the best companies prior to this. The only time there was no mention of corporate members of the class, the non-natural persons, either in the settlement agreement specifically or in preliminary approval or at the preliminary approval hearing, the first time that that was given the opportunity was from our objection and the objection of the 66 corporate defendants who themselves were represented by one counsel, and we came before the court, both made objections. The court then spent substantial time dealing with the corporate issue, recognizing that there were unique challenges for the attestations of the corporations. That was a problem. The court spending those hours then didn't tell any of the corporations who weren't in that courtroom what they can do to correct the attestation. If one doesn't accept the idea that corporations have always been intended to be excluded, and before the court rules on that, I would just direct the court's attention to the record, page 233, which is the claim form approved by the court. That claim form leaves no room for ambiguity that corporations, this was not intended to apply to non-natural persons. Of particular import here is the judge made substantial changes over hours of a hearing on how corporations can do attestations, how they can fill out their claim form, what they can do. Basically, to alleviate, he kept asking during that time to the 66 defendants, does that satisfy you? Can you now submit your claims? The problem is there were substantial and substantive changes made to the claims process that no corporate, no non-natural person ever found out about. The rules of the game were changed by Judge Davila at the hearing, and he didn't tell anyone about it that wasn't in that courtroom. That is patently unfair. There are corporations, non-natural persons out there who didn't receive notice, who could collaterally attack the settlement for a notice point of view. If ACME Corp. received 100 employees received notice, but there was no notice to go to ACME Corp. of any official channel, there was no obligation of the people, just because it's a corporate-owned domain does not mean basic standards of due process that the corporation received notice. I see my time is up, and I appreciate your time today. Thank you. Thank you. Good morning, Your Honors. Kendrick Jan for a Pentonian Feldman Appellants, and I'll be rushed here. But regarding the Hanlon factors, we acknowledge the court did an examination under the Hanlon factors. That's not an issue. The question is, was there an overlay of its presumption? I'm just going to turn to Saucillo and counsel. It stated one thing, that if you do the complete and thorough Hanlon factor analysis, that's sufficient. It is not. It is clearly not. This is from Saucillo. The Rose District Court then evaluated the settlement pursuant to the Hanlon factors, that meaning after it stated its deference. Despite the District Court in Rose only beginning its analysis with a presumption, we reversed because the District Court's declaration that a presumption of fairness applied was erroneous. A misstatement of the applicable legal standard, which governs analysis of the fairness of the settlement. The District here did the same at Saucillo, and I would tell you the District here did the same. Meaning it stated its standard, its lower and inappropriate standard, and then it proceeded to a Hanlon analysis. The same flaw exists in this case as existed in Saucillo. Counsel says, well, nonetheless, there was a searching examination or the heightened scrutiny was applied by the court because of the length of the analysis. Principally, that was a Hanlon analysis, I would say. I would also say, and I want to reiterate, that this is not a harmless error issue. What I'm about to describe is a very substantive concern that the court clearly ignored. So I want to say that this is not a harmless issue, and it is of significance to the court, and it can be seen both in terms of Saucillo, or it can be seen simply in terms of our objection, which was that there was a mismatch between the settlement and the claim form. And if I could very quickly describe what the settlement says. Settlement class means all former or current U.S. owners. For purposes of this definition, U.S. owners shall include individuals who owned, purchased, leased, or otherwise received an eligible device, and individuals who otherwise used an eligible device for personal, work, or any other purposes. Now, there is an incongruence between that and the notice, which is at ER 214. I won't read that. I don't think I have time. But I will read the claim form, or I will refer to the claim form, which uses only the term owner, and only in the present tense. The word former is nowhere used. So right away, your current and former owners, you're neglecting the former owners. But more meaningfully, the term U.S. owners, which is a defined term in the settlement agreement in paragraph 1.32, says that U.S. owners are former and current, okay, but they're owners, lessees, and purchasers, and those who otherwise acquire iPhones, and individuals who used an iPhone, a subject iPhone, for personal or work purposes. Well, what the claim form has done is said, I am, using the present tense, you must attest that I am an owner, not a U.S. owner, an owner. So what that's done is it's taken one narrow little group out of the claim form's broad collection of owners, yes, but not lessees or those that acquire the phone, and it has entirely neglected users for personal, business, and other purposes. Thank you, Counsel. We've got the argument. Am I over? Yes. The clock, I know it's hard to keep track of, but when the light flashes, that's when it's counting upwards. Thank you, Your Honors. Plaintiffs mention the risk as a justification for their attorney's fees, but that directly contradicts Judge Davila's order, which says no single factor or group of factors justifies an upward departure, and risk is one of those factors. So the court's already ruled on that. They didn't cross-appeal that, and the court upward adjusted anyway. And this isn't nitpicking. This is the court ruled. The objectors have the better approach and then ruled in favor of the plaintiffs. And it's that mismatch which is why we're here. If it was just nitpicking, we wouldn't be here. We didn't challenge settlement approval. We only challenged the fees, and we're only appealing the fees. So we have the court not showing its work, but the court did show its work and then came to a conclusion that was entirely different from what that work showed. With respect to the billing review, if we assume that what's really at issue here is the load star, that the district court said, well, a 2.43 multiplier is a windfall, but a 2.23 multiplier is okay, but then we need to be able to litigate the denominator. And we do challenge this at excerpts of record 107 to 111. We raise the Mercury Interactive issue, and they respond, well, there were billing protocols and quarterly reports, but we're entitled to adversary presentation. District courts don't have the resources to take a look at that quarterly report. It must have been a phone book size. We don't know. It's not in the record. To scrutinize that, we don't rely on district courts to perform an investigatory role. We rely on adversary presentation. That's what Mercury Interactive says in interpreting Rule 23H. We weren't given that opportunity, and we raised these are potential issues. We might have found others. In other cases where we did get the billing records, we did find all sorts of other things that weren't disclosed because we didn't get the billing records. The State Street case is an excellent example of that, where class counsel wasn't very forthright until they were forced to turn over the billing records and where the money was going. And here there were 47 firms and 68,000 hours in a case where similar cases, courts have said 30,000 hours was too much. There is a substantial chance we could have had the opportunity to prove duplication, but we were never given that opportunity. If we're going to go with the court did it on a lodestar basis, but everybody said in the briefing the court did it on a percentage of recovery basis, and if that's the answer, then the court's reasoning is completely inconsistent with its conclusion. I'm happy to answer any questions the court has. Mr. Frank, you obviously know this area of law extremely well. Why wasn't the Roe standard just set out very clearly for the district court? Why are we only hearing about it now in a reply brief? How did this happen? We didn't challenge settlement approval. We have no objection to the district court approving the settlement. We didn't object to the settlement approval below. We don't object willy-nilly. We pick and choose our issues. So we didn't have a reason to raise the Roe's issue because we weren't asking the court to do anything with Roe's. You'd have to ask an objector who was challenging settlement approval why they didn't raise Roe's. So at this stage you have no, at least from your client's perspective, you don't think there's an issue there? We don't take a position on it. Any other questions? Thank you, Your Honor. Thank you. Did everybody have a chance? Oh, no. Did everybody have a chance to do rebuttal already? Yes. Here, we've wrapped it up. Thank you very much to all counsel for your arguments today. It's been very helpful. The matter is submitted. Thank you. All rise. The court for this session stands adjourned.
judges: NGUYEN, OWENS, NELSON